[Cite as *In re A.H.*, 2024-Ohio-502.]

| | | |
|---|---|---|
| STATE OF OHIO | )<br>)ss: | IN THE COURT OF APPEALS<br>NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: A.H.
    A.H.
    A.H.

C.A. No.     23CA012001

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    21JC62081
              21JC62082
              21JC62083

DECISION AND JOURNAL ENTRY

Dated: February 12, 2024

HENSAL, Judge.

{¶1} Appellant, P.S. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed three of her minor children in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

{¶2} Mother is the biological mother of the children at issue in this case, each with the initials A.H., born April 4, 2016; July 29, 2017; and January 9, 2020. The children's father ("Father") did not appeal from the permanent custody judgment. Mother has four older children who are not parties to this appeal, but Mother's juvenile history with the older children is relevant to the termination of her parental rights in this case.

{¶3} Included in the record on appeal are the final judgments from three of the juvenile cases involving Mother's older children, which demonstrate the following basic facts. Mother's history with LCCS began in 2009, when Mother's oldest child, then a toddler, was removed from her custody in a prior juvenile case. Mother had been living in an unsafe and unsanitary home and was not meeting the child's other basic needs. No other facts about that case are included in the record, except that the juvenile court ultimately placed the child in the legal custody of a paternal relative.

{¶4} In November 2010, shortly after the birth of Mother's second child, P.M., LCCS received a referral that Mother was again living in unsanitary conditions and lacked adequate supplies to care for her newborn child. Shortly afterward, Mother and P.M.'s father were arrested and incarcerated for allegedly burning down a barn. Mother and the father remained incarcerated for several weeks, and LCCS was unable to find a relative to care for P.M. The juvenile court removed P.M. from the parents' custody, adjudicated the child a dependent and neglected child, and placed the child in the temporary custody of LCCS.

{¶5} Among other things, the case plan in P.M.'s case required Mother to address her untreated mental health problems and demonstrate that she could provide for the child's basic needs. Mother obtained a mental health assessment and was diagnosed with post-traumatic stress disorder. The source of Mother's underlying trauma was never determined or addressed in that case because Mother did not follow up with consistent mental health treatment. The juvenile court ultimately involuntarily terminated Mother's parental rights to P.M. because, despite being offered case plan services for nearly two years, Mother failed to substantially remedy the conditions that caused P.M. to be removed and remain placed outside the home. R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1).

**{¶6}** Mother's third child, M.M. was born on January 3, 2012, 11 months before the termination of Mother's parental rights to P.M. The juvenile court placed M.M. in the emergency temporary custody of LCCS shortly after the child's birth based on Mother's ongoing dependency and neglect case with P.M. The case plan in M.M.'s case also focused on Mother addressing her untreated mental health problems, learning to provide for the basic needs of her child in a safe and sanitary home, and visiting her child regularly to develop and maintain a bond with the newborn child. Mother did not regularly visit M.M. during that case and, although she briefly initiated mental health services, the providers terminated those services due to her noncompliance. The juvenile court involuntarily terminated Mother's parental rights to M.M. on March 11, 2013, based in part on the prior termination of her parental rights to P.M.

**{¶7}** Mother's fourth child, A.M., was born on May 15, 2014. Mother's parental rights to that child were ultimately terminated three months later. According to the final judgment entry in that case, Mother and the child's father agreed to surrender the child to the agency to allow for an open adoption. The juvenile court placed A.M. in the permanent custody of LCCS, but there is nothing in the record to indicate that the termination of Mother's parental rights to A.M. was an involuntary termination under Revised Code Section 2151.414.

**{¶8}** Mother gave birth to A.H., A.H., and A.H. in 2016, 2017, and 2020, and, according to the record, LCCS first became involved with these children in March 2021, when the agency received a referral about a serious domestic violence incident between Father and Mother. During that incident, Father caused cuts and bruises on Mother's face, neck, and chest, and broke several of her ribs and was charged with domestic violence. LCCS initially tried to involve the parents in a voluntary safety plan, but they did not engage in services. Consequently, LCCS later filed complaints to allege that these three children were neglected and dependent because of ongoing

domestic violence between Father and Mother, and Mother's prior juvenile cases with LCCS involving the older siblings of these children.

{¶9} After a contested hearing, the juvenile court adjudicated A.H., A.H., and A.H. dependent and also adjudicated the oldest child neglected because of the parents' additional mistreatment of that child. The court later placed the children in the temporary custody of LCCS. In the dispositional decision, pursuant to a reasonable efforts bypass motion filed by LCCS, the trial court also excused the agency from making reasonable efforts to reunify the children with Mother because of the prior judgments involuntarily terminating her parental rights to her older children. *See* R.C. 2151.419(A)(2)(e). Mother did not file objections to the adjudicatory or dispositional decisions.

{¶10} Despite being excused from working on reunification with Mother, LCCS developed a case plan with reunification goals for her. The case plan required Mother to address her history of her unstable mental health, domestic violence with Father, and her ability to meet the children's basic needs. Mother eventually engaged in parenting classes, mental health counseling, and a domestic violence program. LCCS remained concerned, however, that Mother had not developed insight into how the domestic violence in her relationship with Father affected the children. Moreover, although Mother had obtained a temporary protection order against Father, the agency and the guardian ad litem believed that Mother continued to maintain a romantic relationship with him.

{¶11} LCCS moved for permanent custody of the three children. Following a final dispositional hearing before a magistrate, the trial court terminated parental rights and placed A.H., A.H., and A.H. in the permanent custody of LCCS. Mother filed timely objections to the

magistrate's decision, which were later overruled by the trial court. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

> THE COURT'S DECISION WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE MOTHER MADE SIGNIF[IC]ANT CASE PLAN PROGRESS AS TO SUBSTANCE ABUSE, MENTAL HEALTH, BASIC NEEDS, PARENTING AND DOMESTIC VIOLENCE ENOUGH TO DEFEAT THE AGENCY'S DEMAND FOR PERMANENT CUSTODY.

{¶12} Mother's sole assignment of error is that the permanent custody judgment is not supported by the evidence presented at the hearing. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Revised Code Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the

credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶14} The trial court found that the first prong of the permanent custody test was satisfied as to Mother for two alternative reasons under Sections 2151.414(B)(1)(a) and 2151.414(E). On appeal, Mother challenges only the trial court's finding that the children should not or could not be returned to her custody because she failed to substantially remedy the conditions that caused them to be placed outside the home. R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1). She does not challenge the trial court's alternative finding that the children could not or should not be returned to her home because she had previously had her parental rights terminated as to older siblings of these children and that she failed to prove, by clear and convincing evidence that, "notwithstanding [those] prior termination[s], [she] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child[ren]." R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(11).

{¶15} Because the trial court was required to find only one first-prong ground for permanent custody, any error in its alternative finding would be harmless. *In re K.C.*, 9th Dist. Summit Nos. 29898 and 29899, 2021-Ohio-2489, ¶ 10. For ease of discussion, this Court will confine its review to whether the trial court properly found that Mother's parental rights to the children's older siblings had been involuntarily terminated and that she failed to present clear and convincing evidence that, despite her unresolved problems in those two prior cases, she could now provide A.H., A.H., and A.H. with adequate care in a legally secure permanent placement. *See id.*

{¶16} At the permanent custody hearing, without any objection from Mother, LCCS supported its allegations under Section 2151.414(E)(11) with certified final judgment entries from the juvenile cases involving two of Mother's older children: P.M. and M.M. In each of those cases, the reunification goals of the case plan focused on Mother stabilizing her mental health problems through trauma counseling and learning to obtain and maintain a safe and sanitary home and to otherwise meet the basic needs of her children. After nearly three years of case planning efforts between the two cases, Mother made minimal progress toward reunification. The juvenile court involuntarily terminated Mother's parental rights to P.M. on December 18, 2012, and M.M. on March 11, 2013. This evidence clearly and convincingly established that Mother's parental rights to siblings of these three children had been involuntarily terminated by the juvenile court. *See* R.C. 2151.414(E)(11).

{¶17} The evidence of the prior involuntary terminations of Mother's parental rights would have conclusively established a first-prong ground for permanent custody under the original version of Section 2151.414(E)(11). Prior to 2009, Section 2151.414(E)(11) provided that a prior involuntary termination of parental rights to a sibling of the child, in and of itself, established the parent's unfitness under the first prong of the permanent custody test. *In re G.L.S.*, 9th Dist. Summit Nos. 28874 and 28893, 2018-Ohio-1606, ¶ 19, citing former R.C. 2151.414. Effective April 7, 2009, however, Section 2151.414(E)(11) now permits "the parent to essentially rebut a presumption that, because her parental rights were involuntarily terminated as to her other children, she is not a suitable parent for additional children." *In re E.A.*, 9th Dist. Medina No. 12CA0059-M, 2012-Ohio-5925, ¶ 14. Mother had the burden to rebut the presumption of parental unfitness by clear and convincing evidence. *Id.*, quoting R.C. 2151.414(E)(11).

{¶18} Mother failed to present clear and convincing evidence that she is now able to provide a safe and stable home for A.H., A.H., and A.H. In addition to failing to prove that she had obtained and maintained stable income and housing, Mother failed to establish that she had resolved her ongoing domestic violence problem with Father that had repeatedly required her to receive hospital treatment for her physical injuries and posed an ongoing threat to the physical and emotional wellbeing of her children. The only evidence Mother presented at the hearing was her own testimony, and that of the maternal grandmother, that Mother was no longer involved with Father. Mother's evidence was contradicted by other testimony admitted at the hearing.

{¶19} LCCS presented evidence that, although Mother had completed a domestic violence program, obtained a protection order against Father, and insisted that she ended her relationship with him, Mother continued to maintain a relationship with Father. Father perpetrated domestic violence against Mother on multiple occasions, causing her physical harm, which required hospitalization on at least two occasions. In addition to prior incidents, shortly after LCCS moved for permanent custody, Mother and Father were involved in two more incidents of domestic violence.

{¶20} The specific circumstances of Father's resulting criminal charges and convictions, if any, are not clear from the record, however. The agency did present evidence that Father was incarcerated at different periods during this case related to the domestic violence charges and/or convictions. During Father's incarceration, Mother had 80 telephone calls with Father, which were recorded at the jail. Mother continued to express her love for Father and her desire to continue a relationship with him.

{¶21} While Father was incarcerated for a few weeks during May and June 2022, Mother promised him that she would meet him at the jail upon his release and would plan a celebration for

him for Father's Day. She asked Father what kind of alcoholic drink he wanted her to buy for the celebration, even though Father's substance abuse and its connection to his acts of domestic violence was one of the primary concerns on the case plan. At the Father's Day celebration, Mother and Father became heavily intoxicated, another incident of domestic violence ensued, Mother sustained serious physical injuries and required hospitalization, and Father was arrested and again charged with domestic violence.

{¶22} LCCS also presented copies of letters that Mother and the paternal grandmother sent to the court in one of Father's criminal cases, asking the court to dismiss the domestic violence charges and to drop the temporary protection order against Father because Mother had lied about him hurting her. The caseworker testified that, after that same incident, she had observed a large bruise on Mother's arm. The agency also introduced a later motion that Mother sent to the criminal court in the same case, asking the court to dismiss the temporary protection order because she was injured and needed Father to take care of her. The criminal court initially denied Mother's request but ultimately dismissed Mother's protection order against Father.

{¶23} Additionally, the caseworker testified that, several months before the final hearing, a paternal cousin of the children ("Cousin") began visiting the children and was planning to pursue legal custody because she wanted to preserve the family. Cousin had also tried to support Mother's reunification efforts and gave Mother money to help with her finances. After Cousin learned that Mother had given the money to Father to put in his jail account, Cousin told the caseworker that she was not going to pursue legal custody. Cousin expressed frustration and disappointment that Mother continued to prioritize Father over her children.

{¶24} Moreover, as Mother's testimony continued, she backed off her initial insistence that Father was out of her life. When she was questioned by the magistrate, Mother admitted that

she had given the money from Cousin to Father for his jail account, rather than using it for herself or the children, as Cousin had intended. She also conceded that she had not ended her relationship with Father. The magistrate asked Mother whether she had ended her relationship with Father and Mother responded, "I am trying. And if you'll give me a chance, I could prove that I can break contact with [him]."

{¶25} Weighing the evidence presented by Mother that she had ended her relationship with Father, which was contradicted by the agency's evidence and part of Mother's own testimony, the trial court concluded that the evidence that Mother had not ended her relationship with Father was more persuasive. Consequently, the record supported the trial court's conclusion that LCCS established a first-prong ground for permanent custody under Section 2151.414(B)(1)(a) and 2151.414(E)(11) based on the prior involuntary terminations of Mother's parental rights and her failure to present clear and convincing evidence that, despite those prior terminations, she is now able to provide these children with a safe and stable permanent home.

{¶26} Next, the trial court was required to find that permanent custody was in the best interest of the children. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in Section 2151.414(D). *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 25. In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, the custodial history of the children, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in Section 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. As explained above, the trial court found that Section 2151.414(E)(11) applied to the facts

of this case, and it was required to consider the two prior involuntary terminations of Mother's parental rights again in its best interest determination.

{¶27} Witnesses agreed that Mother's interaction with the children during this case was positive and that they observed a mother-child bond between Mother and each of the children. Throughout this case, however, Mother's visits continued to be supervised because of concerns that Mother would expose the children to Father and fail to protect them. Although Mother would tell the caseworker that Father was out of her life, the evidence demonstrated that she continued her relationship with him, and that he had not resolved his own parenting problems. Father had not worked on the reunification goals of the case plan but continued to abuse drugs and alcohol and perpetrate domestic violence against Mother.

{¶28} The older children had informed the guardian ad litem that they wanted to return to Mother's home. She opined, however, that permanent custody was in their best interest because of the history of domestic violence by Father against Mother, Mother's denial that their relationship continues, and her lack of insight into how that violence affects the children. The guardian ad litem expressed particular concern that Mother had dropped the protection order that she had in place to protect herself and the children from future acts of domestic violence by Father.

{¶29} By the time of the permanent custody hearing, these three children had been in the temporary custody of LCCS for well over a year. They needed a legally secure permanent placement and LCCS had been unable to find a suitable relative who was willing and able to provide the children with a stable, permanent placement. As explained already, Mother was not prepared to provide the children with a safe and stable home at that time. The trial court had substantial evidence before it to support its conclusion that a legally secure permanent placement would be achieved by placing the children in the permanent custody of LCCS.

**{¶30}** Finally, as part of its best interest determination, the trial court was required to again consider that Mother's parental rights had been involuntarily terminated as to two of these children's older siblings and that Mother had failed to present clear and convincing evidence that, despite those prior terminations, she could now provide these children with "a legally secure permanent placement and adequate care for [their] health, welfare, and safety[.]" R.C. 2151.414(D)(1)(e); R.C. 2151.414(E)(11). As explained in this Court's review of the trial court's finding on the first prong of the permanent custody test, the evidence was undisputed that Mother's parental rights to two older siblings of these children had been involuntarily terminated on December 18, 2012, and March 11, 2013.

**{¶31}** Despite the passage of nearly a decade, and Mother's involvement in case plan services in this case, LCCS presented substantial evidence that Mother remained romantically involved with Father and continued to be the victim of his repeated acts of domestic violence. Mother expressed her devotion to Father during telephone calls to the jail.

**{¶32}** Although Mother had earlier secured a protection order against Father, Mother held a party for Father while he was briefly out of jail. Father became violent at the party, injured Mother, and was again charged and incarcerated.

**{¶33}** After Father was reincarcerated, and Mother was presumably safe from him, Mother sent written communications to the criminal court to attempt to get the criminal charges and protection order against Father dropped. The criminal court eventually granted Mother's request to drop the protection order, which had been put in place to protect her from future acts of domestic violence by Father. Due to Father's ongoing domestic violence against Mother, Mother failed to rebut the presumption that she remained unable to provide her children with a safe and stable home.

**{¶34}** Given all the evidence admitted at the hearing, Mother has failed to demonstrate that the trial court lost its way by terminating her parental rights and placing A.H., A.H., and A.H. in the permanent custody of LCCS. *See Eastley* at ¶ 20. Mother's assignment of error is overruled.

III.

**{¶35}** Mother's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
FLAGG LANZINGER, J.
CONCUR.


APPEARANCES:

MARC STOLARSKY, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and LEIGH S. PRUGH, Assistant Prosecuting Attorney, for Appellee.

TIM GREEN, Guardian ad Litem.